Frankie L. BARBER, Plaintiff–Appellee,

v.

WHIRLPOOL CORPORATION, Defendant–Appellant.

No. 93–1716.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 9, 1994.

Decided Aug. 29, 1994.

**ARGUED:** Keith C. Hult, Wildman, Harrold, Allen & Dixon, Chicago, IL, for appellant. Grenville D. Morgan, Jr., McCutchen, Blanton, Rhodes & Johnson, Columbia, SC, for appellee. **ON BRIEF:** Frederick L. Schwartz, Wildman, Harrold, Allen & Dixon, Chicago, IL, for appellant. Ronald James Tryon, McCutchen, Blanton, Rhodes & Johnson, Columbia, SC, for appellee.

Before ERVIN, Chief Judge, and RUSSELL and HALL, Circuit Judges.

Affirmed in part, reversed in part, vacated in part and remanded for a new trial by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge DONALD RUSSELL and Judge K.K. HALL joined.

## OPINION

ERVIN, Chief Judge:

Whirlpool Corporation accused Frankie Barber, its employee, of stealing some painting equipment from the Columbia, South Carolina plant at which he worked. On the basis of two unsigned statements of Whirlpool's undercover investigator, warrants were sworn out for Barber's arrest. Whirlpool eventually terminated Barber's employment. Barber sued Whirlpool in state court, alleging intentional infliction of emotional distress, malicious prosecution, libel and slander, and intentional interference with prospective contractual relations. Whirlpool removed the action to the U.S. District Court for the District of South Carolina, Columbia Division, on the basis of diversity jurisdiction. The court granted summary judgment for Whirlpool as to Barber's claim of intentional interference with prospective contractual relations and his libel and slander claims. Barber does not appeal that decision.

Trial was held on the remaining two counts beginning April 6, 1992. The jury returned a verdict on April 9 in favor of Barber, granting him $75,000 in actual damages and $125,000 in punitive damages. On May 4, 1993, the district court held a hearing on Whirlpool's posttrial motions seeking judgment as a matter of law, a new trial or remittitur. The motions were denied from the bench. At the end of the hearing, the court indicated that a written order would be entered and requested Barber's counsel to suggest language for the order. A notation was made on the docket reflecting the bench ruling and indicating that counsel would prepare a final order to be entered by the court. Thereafter, the clerk of court allegedly told Whirlpool that the filing period for appeals began on May 4, the day of the bench ruling. Whirlpool filed notice of appeal on June 3, 1993. The court entered its written Order on June 22 and Whirlpool did not refile its notice of appeal following entry of the judgment.

Whirlpool appeals the district court's denial of its posttrial motions. Barber challenges this court's jurisdiction, arguing that the notice of appeal was ineffective because it was filed before entry of final judgment by the district court. For the reasons set forth below, Barber's motion to dismiss for lack of jurisdiction is denied and the decision of the district court regarding Whirlpool's posttrial motions is affirmed in part and reversed in part.

## I.

Whirlpool Corporation hired Frankie Barber in January 1988 to work in its Columbia, SC manufacturing plant. In September 1989, Whirlpool hired an undercover investigator, Raven Chaney, to look into suspected illegal activity at the plant, and paid the Richland County Sheriff's Department to direct the investigation. Chaney made written reports to Whirlpool and the Sheriff's Department that stated that Barber had stolen two paintbrushes on January 5, 1990 and four paint rollers and one roller handle on January 19, 1990. In May 1990, Whirlpool decided to discontinue the investigation and make arrests based on its discoveries at the plant. Whirlpool gave Officer Wes Bickley of the Richland County Sheriff's Department two unsigned statements from Chaney and directed him to obtain warrants for Barber's arrest. On June 20, 1990 Bickley went to the magistrate and had two warrants issued for Barber's arrest for petty larceny.

Barber was not informed of the outstanding warrants against him until June 28, 1990.

On that day, Robert Raines, Whirlpool's Manager of Human Resources, called Barber into his office towards the end of Barber's shift at 5:30 a.m. and informed him that Whirlpool had issued warrants for his arrest and that the police would probably pick him up. Barber became very upset, nauseous, and began crying. He denied any wrongdoing. Barber claimed that on the two occasions in question, Chaney approached him and offered him the material. On the first occasion, Chaney put the brushes on top of a cabinet and told Barber to take them. Barber refused and never touched the brushes. Barber claims that on the second occasion, Chaney told Barber to pick up a box and Chaney then placed the rollers in the box. Barber never touched the material. He immediately decided that it wasn't worth losing his job over, put the box on the floor and never removed anything from the plant.

Chaney claims that Barber asked him for the equipment on both occasions and each time Barber removed the material from a cabinet that Chaney opened for him. Chaney claims that Barber left with the material on both occasions, although Chaney did not actually see the material in Barber's possession when he left the plant either time.

After hearing Barber's response at the meeting on June 28, Raines told Barber, who was visibly upset, to go home and wait for a call from Raines later that day. Barber returned home, phoned the Sheriff's Department and was told to call back later. Barber then found an attorney through the yellow pages and spoke with him at 8:30 a.m. Barber then called the Sheriff's Department a second time at 9:00 a.m. and was informed that there were warrants out for his arrest and that he could either come by to turn himself in at 2 p.m. that afternoon and be free to go home after booking or an officer would come to his home to take him into custody. Barber decided to turn himself in rather than be arrested at his home. He called the Sheriff's Department a third time that morning to ask directions and to tell them he would report to the station at 2 p.m.

At noon, Barber received a call from Raines instructing him to come to the plant. At the plant, Raines told Barber that the warrants would be canceled and that Raines now believed that Barber was not guilty of any wrongdoing. Barber was scheduled to leave on vacation the next day during the plant's annual two week shutdown. Raines told Barber to enjoy his vacation and to return as the same good employee he had always been. Barber worked his shift that night and left on vacation the next day, scheduled to return on Monday, July 16, 1990.

On Friday, July 13, 1990 Raines left a message on Barber's answering machine instructing him to come to his office at 8:30 a.m. on Monday. Barber called Raines to see what was going on and Raines said he had reopened the case. Raines asked Barber if he could come to the plant immediately instead of waiting until Monday. Barber was about to leave for Winston–Salem for the weekend and the plant was on the way, so he told Raines that he would stop by. The plant was still closed as a result of the shutdown, but the security guard let Barber and his wife enter when Barber informed him that Raines was expecting him. Barber and Raines went into a conference room together and Barber's wife waited outside the door. Barber asked why Raines had reopened the case. Raines told Barber that Raines now believed he was guilty. He repeatedly accused Barber of stealing the painting material and tried to get him to admit it. The conversation became very emotional and Barber started crying. After about twenty minutes, his wife could hear that Barber's voice was upset and she knocked on the door to try to stop the interrogation. Raines opened the door, informed her "I'm not done yet, little lady" and closed the door. After repeated questioning, Barber finally said that "maybe" he had had the intent to steal for a moment when Chaney put the rollers in the box in Barber's hands but that he had immediately decided it wasn't worth losing his job over. He put the box down and never took anything. Raines told him to leave. On his way out of the building, Barber remembered the warrants and rushed back to Raines to inquire about them and about his employment status. Raines said the warrants were out of his hands and he could do nothing more

about it; he would call Barber later about his employment status.

Upon leaving the plant, Barber's wife drove them to Winston–Salem. Barber stayed in a bedroom for the entire weekend, cried, took nerve medication and contemplated suicide. He was worried that he would be arrested and lose his job, his reputation and his children's respect. He had trouble sleeping for a week. After returning to Columbia, he was terminated by Raines on Monday, July 16, 1990. Later that day, Barber informed his two children that he had been accused of theft and terminated by Whirlpool. He also told them that warrants were outstanding for his arrest and he didn't know whether or not he would go to jail. Barber subsequently filed this suit for intentional infliction of emotional harm and malicious prosecution, among other claims.

## II.

### A.

■ Barber argues that this court lacks jurisdiction to hear Whirlpool's appeal because its notice of appeal was filed prior to the issuance of final judgment. Barber maintains that the district court's final judgment was entered on June 22, 1993 when its written Order was entered on the docket. Barber therefore concludes that Whirlpool's June 3 notice of appeal is ineffective. We disagree.

Federal Rule of Appellate Procedure 4(a)(4) was amended effective December 1, 1993, so that it now reads:

If any party makes a timely motion of a type specified immediately below, the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding. This provision applies to a timely motion under the Federal Rules of Civil Procedure:

 (A) for judgment under Rule 50(b);

 (B) to amend or make additional findings of fact under Rule 52(b), whether or not granting the motion would alter the judgment;

 (C) to alter or amend the judgment under Rule 59;

 (D) for attorney's fees under Rule 54 if a district court under Rule 58 extends the time for appeal;

 (E) for a new trial under Rule 59; or

 (F) for relief under Rule 60 if the motion is served within 10 days after the entry of judgment.

*A notice of appeal filed after announcement or entry of the judgment but before disposition of any of the above motions is ineffective to appeal from the judgment or order, or part thereof, specified in the notice of appeal, until the date of the entry of the order disposing of the last such motion outstanding.* Appellate review of an order disposing of any of the above motions requires the party, in compliance with Appellate Rule 3(c), to amend a previously filed notice of appeal. A party intending to challenge an alteration or amendment of the judgment shall file an amended notice of appeal within the time prescribed by this Rule 4 measured from the entry of the order disposing of the last such motion outstanding. No additional fees will be required for filing an amended notice.

Fed.R.App.P. 4(a)(4) (emphasis added). The Notes of Advisory Committee on Appellate Rules state with respect to the 1993 amendment that

the 1979 amendment of this paragraph created a trap for an unsuspecting litigant who files a notice of appeal before a posttrial motion, or while a posttrial motion is pending. The 1979 amendment requires a party to file a new notice of appeal after the motion's disposition. Unless a new notice is filed, the court of appeals lacks jurisdiction to hear the appeal. *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56 [103 S.Ct. 400, 74 L.Ed.2d 225] (1982). Many litigants, especially pro se litigants, fail to file the second notice of appeal, and several courts have expressed dissatisfaction with the rule. *See, e.g., Averhart v. Arrendondo,* 773 F.2d 919 (7th Cir.1985); *Harcon Barge Co. v. D & G Boat Rentals, Inc.,* 746 F.2d 278 (5th Cir. 1984), *cert. denied,* 479 U.S. 930 [107 S.Ct. 398, 93 L.Ed.2d 351] (1986).

The [1993] amendment provides that a notice of appeal filed before the disposition of

a specified posttrial motion will become effective upon disposition of the motion. A notice filed before the filing of one of the specified motions or after the filing of a motion but before disposition of the motion is, in effect, suspended until the motion is disposed of, whereupon, the previously filed notice effectively places jurisdiction in the court of appeals....

Fed.R.App.P. 4 advisory committee's note to 1993 amendment.

The Supreme Court, by Order of April 22, 1993, determined that

the foregoing amendments to the Federal Rules of Appellate Procedure shall take effect on December 1, 1993, and shall govern all proceedings in appellate cases thereafter commenced and, insofar as just and practicable, all proceedings in appellate cases then pending. No injustice would be worked by applying the new Rule 4(a)(4) to the case at bar. The amendment works to preserve appealability and allows us to reach the merits of Whirlpool's claims.

Barber urges this court to follow *Acosta v. Louisiana Department of Health and Human Resources,* 478 U.S. 251, 106 S.Ct. 2876, 92 L.Ed.2d 192 (1986). In *Acosta,* the Court held that a notice of appeal is ineffective unless filed after entry of judgment on the specified posttrial motions. 478 U.S. at 254, 106 S.Ct. at 2877. The Court, however, based its decision on the pre–1993 version of Fed.R.App.P. 4(a)(4) which specifically provided that

a notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above....

The 1993 amendment to the Rule has rendered *Acosta* no longer good law. Whirlpool's notice of appeal filed on June 3, 1993 became effective upon entry of final judgment.

### B.

We must next consider whether the district court's written Order of June 22, 1993 constituted a final judgment, rendering the notice of appeal effective.

■ Federal Rule of Civil Procedure 58, as interpreted by this court in *Caperton v. Beatrice Pocahontas Coal Co.,* 585 F.2d 683 (4th Cir.1978), requires that a final judgment be set forth in a document separate from the opinion explaining the judgment. In *Caperton,* a ten-page Opinion and Order setting forth findings of fact and conclusions of law with an order of dismissal "tacked onto the end" was found insufficient to satisfy the rule. 585 F.2d at 689. In *Caperton,* both parties agreed that the Opinion and Order of the court constituted final judgment. This court, however, disagreed and found that no separate judgment had been entered and that the filing period had therefore not commenced. Accordingly, no effective notice of appeal was filed.

This court next found, however, that it nonetheless had jurisdiction to hear the appeal in these circumstances because " 'certainty as to timeliness ... is not advanced by holding that appellate jurisdiction does not exist absent a separate document.' " *Id.* at 690 (quoting *Bankers Trust Co. v. Mallis,* 435 U.S. 381, 385, 98 S.Ct. 1117, 1120, 55 L.Ed.2d 357, *reh'g denied,* 436 U.S. 915, 98 S.Ct. 2259, 56 L.Ed.2d 416 (1978)). As the Supreme Court has indicated, the policy behind the separate document rule is to make clear when filing periods begin. *Mallis,* 435 U.S. at 384, 98 S.Ct. at 1120. The rule is meant

to simplify and make certain the matter of appealability. It is not designed as a trap for the inexperienced.... The rule should be interpreted to prevent loss of the right of appeal, not to facilitate loss.

*Id.* at 386, 98 S.Ct. at 1121 (internal quotations omitted). The Court found that an appeal may be heard where (1) it is clear that the district court intended the opinion and order from which an appeal was taken to represent the final decision in the case, (2) the judgment is recorded in the clerk's docket, and (3) the appellee does not object to the taking of the appeal in the absence of a separate judgment. *Id.* at 387–88, 98 S.Ct. at 1121.

In the case at bar, the court's Order was an eleven page document setting forth findings of fact and conclusions of law. The last page was an order dismissing Whirlpool's posttrial motions. The Order, therefore, did not constitute a final judgment under the separate document rule of *Caperton*. Accordingly, the filing period for appeals never began and no effective notice of appeal has been filed.

The three conditions permitting our review, however, have been met in this case. The record indicates that the district court intended the Order to represent its final decision and a notation was recorded in the docket. Barber agrees that the June 22 Order represents final judgment and he does not suggest that a separate document is required.

The policy considerations set forth in *Mallis* therefore control, and the separate document rule should not be applied to facilitate loss of appealability. "Upon dismissal, the district court would simply file and enter the separate judgment, from which timely appeal would then be taken. Wheels would spin for no practical purpose." *Mallis*, 435 U.S. at 385, 98 S.Ct. at 1120. We decline to require such a useless exercise. Because the conditions prescribed by *Mallis* have been met, we find that jurisdiction lies with this court, despite the lack of a final judgment set forth in a document separate from the opinion explaining it.

### III.

Whirlpool argues that Barber's claim for intentional infliction of emotional distress should not have been submitted to the jury because the claim is preempted by South Carolina's Workers' Compensation Act and because there was no evidence that Whirlpool's conduct was outrageous. While we disagree with Whirlpool's preemption argument, we agree that the district court should have granted judgment as a matter of law in favor of Whirlpool and accordingly reverse that portion of the district court's decision.

### A.

Damages for emotional injuries are recoverable under South Carolina's Workers' Compensation Act. *Loges v. Mack Trucks*, 308 S.C. 134, 417 S.E.2d 538, 540 (1992). Intentional infliction of emotional distress is within the scope of the Act. *Id.* To be covered by the Act, however, the injury must have arisen out of and in the course of employment. *Doe v. South Carolina State Hospital*, 285 S.C. 183, 328 S.E.2d 652, 654 (Ct. App.1985).

An injury "arises out of" one's employment if there is a causal relationship between the conditions of work and the injury. *Id.*, 328 S.E.2d at 655. This requirement focuses on the origin of the cause of the injury. *Loges*, 417 S.E.2d at 540. Here, it is undisputed that Barber's emotional distress was caused by conditions related to his employment with Whirlpool.

The injury must, however, also arise "in the course of" employment. This requirement focuses on the time, place and circumstances of the accident. *Id.* Under South Carolina law, an employee on vacation is not within the protection of the Workers' Compensation Act. *LaMott v. West Columbia*, 259 S.C. 594, 193 S.E.2d 592, 593 (1972); *Williams v. Columbia*, 218 S.C. 287, 62 S.E.2d 469, 470 (1950). Barber was on vacation on July 13, 1990. Raines ordered him by telephone message to report to his office on Monday morning when he returned to work, a meeting that clearly would have been in the course of Barber's employment. Barber called Raines on Friday, however, while Barber was still on vacation and Raines asked if Barber could stop by that day. Barber agreed. He was not required to report to the plant. The plant was still officially closed due to the annual shutdown. The July 13 meeting did not take place "in the course of" his employment. Any injuries sustained during that meeting were not covered by workers' compensation, and the district court had jurisdiction to hear the claim.

### B.

South Carolina recognizes the tort of intentional infliction of emotional distress as

set forth in § 46 of the Restatement (2d) of Torts. *Ford v. Hutson,* 276 S.C. 157, 276 S.E.2d 776, 778 (1981). Under South Carolina law, to prove a claim for intentional infliction of emotional distress Barber must show that (1) Whirlpool intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from its conduct; (2) its conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) its acts caused Barber's distress; and (4) Barber's distress was severe so that no reasonable person should be expected to endure it. *Id.* 276 S.E.2d at 778. In *Ford,* the South Carolina Supreme Court upheld a jury's determination that the defendant was liable for intentional infliction of emotional distress where the defendant engaged in a two-year campaign of harassment that culminated in plaintiff's hospitalization for depression. *Id.* 276 S.E.2d at 780. In that case, a dissatisfied homebuyer relentlessly pursued the seller, launching vicious and profane verbal attacks and threats in public places. The court found that

> when evidence is in conflict and susceptible of more than one reasonable inference, it is the province of the jury to make a factual determination. We cannot say, as a matter of law, that the trial judge erred in submitting the issues to the jury. The evidence is legally sufficient to support the verdict.

*Id.*

█ It is the court's responsibility to first determine as a matter of law whether or not the conduct in question was outrageous before submitting that question to the jury. *Satterfield v. Lockheed Missiles & Space Co.,* 617 F.Supp. 1359, 1365, 1369 (D.S.C.1985) (citing *Todd v. South Carolina Farm Bureau Mut. Ins. Co.,* 283 S.C. 155, 321 S.E.2d 602, 609–10 (Ct.App.1984), *quashed in part,* 287 S.C. 190, 336 S.E.2d 472 (1985)). In *Satterfield,* a wrongful termination suit, the district court granted summary judgment for the defendant on the plaintiff's intentional infliction of emotional distress claim. In that case, the plaintiff was terminated on the basis of a faulty urinalysis test. The plaintiff and the defendant-employer debated about the results of the test for over two weeks, while the plaintiff was kept in doubt as to his employment status and was very depressed. The court found that the defendant's actions did not constitute outrageous conduct. Similarly, in *Todd,* the Court of Appeals of South Carolina reversed a jury verdict in favor of an employee by finding that his employer had not acted outrageously in terminating the employee. *Todd,* an insurance agent, was accused by his employer of leaking information about arson investigations to the arsonist. As a result of the accusations, administration of an illegal polygraph test and termination of his contracts, Todd suffered stress and strain, embarrassment and shame. The jury awarded him actual and punitive damages. The court found that the issue should not have gone to the jury because Todd had presented no evidence of outrageous conduct.

█ The conduct forming the basis of Barber's claim is Raines' conduct in his July 13, 1990 meeting with Barber. No other conduct may be considered because all other acts occurred "in the course of" Barber's employment and are preempted by Workers' Compensation. There is evidence in the record that Raines, a former marine officer, was verbally abusive in his forty minute meeting with Barber. Barber became very upset and remained so for the rest of the weekend. Although this conduct is despicable, it does not rise to the level of being atrocious and utterly intolerable in a civilized community. Whirlpool's conduct is closer to that in *Satterfield* and *Todd,* rather than to that in *Ford.*

Because Barber did not establish outrageous conduct, the court should have granted Whirlpool's motion for judgment as a matter of law. We accordingly reverse the district court's denial of judgment as a matter of law with respect to the intentional infliction of emotional distress claim.

### IV.

We must next address Whirlpool's contention that the district court erred in denying

its motion for judgment as a matter of law with respect to the malicious prosecution claim.

■ In order to establish malicious prosecution, Barber must show that Whirlpool maliciously instituted proceedings without probable cause against Barber that terminated in his favor, resulting in injury to Barber. *Eaves v. Broad River Elec. Coop., Inc.*, 277 S.C. 475, 289 S.E.2d 414, 415 (1982).

■ Whirlpool claims that because the warrants were dismissed and Barber was never arrested, proceedings were not instituted against him. Supporting its argument, Whirlpool cites *Clemmons v. Nicholson*, 180 S.C. 54, 185 S.E. 34, 35 (1936), which states that "in order to maintain an action for malicious prosecution, it is indispensable that there be an arrest." *Clemmons* goes on to state, however, that

> a correct criterion by which to determine whether a prosecution has or has not been commenced, will perhaps be best formed by inquiring whether the proceedings are in such a situation as to put it in the power of the party prosecuted to compel the State to proceed, or to procure his own discharge, which can never happen until he is a party to them. . . . Justice dictates that where a citizen is in due form, that is, upon an affidavit and warrant issued for him by a lawful magistrate, charged with a crime, especially a felony, such citizen has the right to compel the state to proceed. . . .

*Id.* 185 S.E. at 36. In that case, warrants were sworn out for plaintiff's arrest and plaintiff demanded a preliminary hearing at which the charges were dismissed. Although plaintiff was never actually arrested, the court went on to say that he had been constructively arrested. *Id.*

The warrants issued for Barber empowered and directed the Sheriff's Department to arrest Barber as soon as practicable. Barber had knowledge of the warrants and had determined that he would surrender himself at 2 p.m. on June 28, 1990 rather than be picked up at home in front of his children. Barber clearly had the power to compel the state to proceed during this peri-od before the warrants were dismissed. There was substantial evidence to support the jury's finding that proceedings were instituted against Barber.

■ Barber must also prove that the proceedings were instituted by Whirlpool. Although Officer Bickley actually swore out the warrants, he did so upon the insistence and instruction of Whirlpool. J.A. 325. All of the information upon which the warrants were issued was provided by Whirlpool and its agent. Furthermore, when Raines spoke with Barber on June 28, 1990, Raines told Barber that Raines now believed Barber and that Raines would have the warrants cancelled. Raines thus indicated that he had substantial control over the issuance of the warrants. Where a defendant does not prosecute a warrant personally, he may still be liable for malicious prosecution if he causes one to be maintained or voluntarily aids or assists in its prosecution. *Gibson v. Brown*, 245 S.C. 547, 141 S.E.2d 653, 654 (1965). The evidence supports a jury conclusion that Whirlpool instituted proceedings against Barber.

There is no question but that the proceedings were terminated in Barber's favor. The warrants were eventually dismissed. Furthermore, his testimony about his sleeplessness, contemplation of suicide and depression supports a jury finding that injury resulted to him from the issuance of the warrants for his arrest.

■ The final issue which the jury must decide is whether Whirlpool lacked probable cause to institute proceedings; malice can be inferred therefrom. Probable cause exists where, based on the facts that were known or should have been known to the prosecutor at the time proceedings were instituted, a reasonable person would believe the plaintiff to be guilty. *Whitner v. Duke Power Co.*, 277 S.C. 397, 288 S.E.2d 389 (1982); *Elletson v. Dixie Home Stores*, 231 S.C. 565, 99 S.E.2d 384, 387 (1957). The determination of whether probable cause existed is to be made by the jury. *Elletson*, 99 S.E.2d at 387.

The jury was presented with evidence that Raines decided to instruct Bickley to issue

the warrants on the basis of two unsigned statements of an outside undercover investigator whose job was to inform on employees. There were inconsistencies between Chaney's statements and Chaney's field notes and Whirlpool did no independent investigation. The jury could have concluded that a reasonable person would not have found probable cause to arrest Barber on the basis of this information and would have done more investigation. Raines' professed cancellation of the warrants after hearing Barber's side of the story at the noon meeting on June 28, 1990 also indicates that the smallest effort at further investigation would have shown the warrants unfounded. The jury therefore could have reasonably concluded that there was no probable cause for the warrants. The jury may infer malice from this lack of probable cause.

Because substantial evidence supports the jury's finding of each element of the malicious prosecution claim, the district court did not err in refusing Whirlpool's motion for judgment as a matter of law. The district court's decision in this regard is affirmed.

## V.

Whirlpool argues that the jury's award of damages cannot stand if either of the two underlying claims is reversed because the general verdict form did not apportion damages between the claims of intentional infliction of emotional distress and malicious prosecution. We agree.

 Federal procedural law governs the use of general or special verdicts. *Flowers v. Tandy Corp.*, 773 F.2d 585, 591 (4th Cir.1985).[1] In *Flowers,* this court stated that "because of the impossibility of knowing but what the jury's verdict rested on the legally erroneous theory, such a general verdict may not stand as the basis for judgment." *Id.* (citing, *Gill v. Rollins Protective Services Co.,* 722 F.2d 55, 59 (4th Cir.1983), citing *United New York and New Jersey Sandy Hook Pilots Association v. Halecki,* 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541

(1959)). While the liability verdict need not be disturbed because the verdict form made it clear that the jury found Whirlpool liable for both intentional infliction of emotional distress and malicious prosecution, the damages award must be vacated. The jury awarded a global figure without distinguishing the amount attributable to each claim. A new trial is necessary on the damages issue. *In re Air Crash Disaster at New Orleans,* 795 F.2d 1230, 1235–36 (5th Cir.1986).

 Barber urges us to apply state law to the general verdict issue. South Carolina adheres to the "two issue" rule providing that where the jury returns a general verdict involving two or more issues and its verdict is supported as to at least one issue, the verdict will not be reversed on appeal. *Todd,* 321 S.E.2d at 606. Under South Carolina law, once defense counsel has agreed to the use of a general verdict form, she cannot later be heard to complain. 321 S.E.2d at 607. Because federal law controls verdicts, however, we must apply the *Flowers* rule and vacate the damage award. We accordingly remand for a new trial on damages.

## VI.

Whirlpool contends that there was insufficient evidence to support the jury's award of punitive damages.

 Under South Carolina law, punitive damages are permissible where the conduct of the defendant was wilful, wanton or reckless; conscious wrongdoing must be proven. *Mattison v. Dallas Carrier Corp.,* 947 F.2d 95 (4th Cir.1991). Under *Mattison,* 947 F.2d at 109, a federal district court applying South Carolina law must rely on the following factors set forth in *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350, 354 (1991), when charging the jury on the availability of punitive damages:

(1) the defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or oth-

---

1. *See Geosearch, Inc. v. Howell Petroleum Corp.,* 819 F.2d 521, 527 (5th Cir.1987). In that diversity case, the court found that federal law controlled the interpretation of special interrogatories relating to damages.

ers from like conduct; (6) whether the award is reasonable related to the harm likely to result from such conduct; (7) defendant's ability to pay; and, finally, (8) ... other factors deemed appropriate.

The determination of damages is left to the discretion of the jury, to be reviewed by the district court in accordance with federal standards of review under Rule 50(b) and Rule 59. The award shall stand unless no substantial evidence is presented to support it, it is against the clear weight of the evidence, it is based upon evidence that is false, or it will result in a miscarriage of justice. *Mattison*, 947 F.2d at 100.

■■■ The district court correctly charged the jury, specifically listing each of the *Gamble* factors. It is not clear from the verdict, however, whether the jury's award of punitive damages was based on intentional infliction of emotional distress or malicious prosecution. Substantial evidence was presented with respect to the malicious prosecution claim that Whirlpool wilfully and consciously insisted on the issuance of the warrants without probable cause. The jury may have determined that Whirlpool's conduct in this regard should be sanctioned, in which case the award would be permissible. Because the verdict is ambiguous, however, the punitive damages award must be vacated and redetermined at the new trial.

### VII.

■■■ Whirlpool finally objects to the malicious prosecution instruction given by the district court because it included an example of constructive arrest, a theory Whirlpool claims is inapplicable. Where jury instructions are challenged, the inquiry is whether, taken as a whole, the instructions given fairly state the controlling law. *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir.1990), *cert. denied, Hatcher v. United States*, 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991). We have reviewed the record and find that the jury instructions in this case meet that standard.

### VIII.

Based on the foregoing analysis, we reverse the district court's denial of Whirlpool's motion for judgment as a matter of law with respect to the intentional infliction of emotional distress claim. We affirm the district court's decision with respect to the malicious prosecution claim, but vacate the damages award and remand for a new trial on that issue.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND RE-MANDED FOR A NEW TRIAL.*